FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Jun 10, 2020

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| REBECCA P.,[1] <br><br> Plaintiff, <br><br> v. <br><br> ANDREW M. SAUL, the Commissioner of Social Security, <br><br> Defendant. | No.    4:19-CV-5206-EFS <br><br> **ORDER GRANTING PLAINTIFF'S SUMMARY-JUDGMENT MOTION AND DENYING DEFENDANT'S SUMMARY-JUDGMENT MOTION** |

Plaintiff Rebecca R. slipped and fell on ice at work in January 2009. She suffered physically and mentally, necessitating spine and shoulder surgery and mental-health medication and treatment. In 2015, Plaintiff applied for disability insurance benefits. Plaintiff appeals the denial of benefits by the Administrative Law Judge (ALJ). Before the Court are the parties' cross summary-judgment motions.[2] Plaintiff alleges the ALJ erred by 1) improperly determining that pain disorder was not a severe impairment; 2) discounting her symptom reports; 3)

---

[1] To protect the privacy of the social-security Plaintiff, the Court refers to her by first name and last initial or by "Plaintiff." *See* LCivR 5.2(c).

[2] ECF Nos. 10 & 11.

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 1

improperly weighing the medical opinions; and 4) improperly assessing her residual functional capacity and therefore relying on incomplete hypotheticals at steps four and five. In contrast, Defendant Commissioner of Social Security asks the Court to affirm the ALJ's decision finding Plaintiff not disabled. After reviewing the record and relevant authority, the Court grants Plaintiff's Motion for Summary Judgment, ECF No. 10, and denies the Commissioner's Motion for Summary Judgment, ECF No. 11.

## I.    Five-Step Disability Determination

A five-step sequential evaluation process is used to determine whether an adult claimant is disabled.[3] Step one assesses whether the claimant is currently engaged in substantial gainful activity.[4] If the claimant is engaged in substantial gainful activity, benefits are denied.[5]

Step two assesses whether the claimant has a medically severe impairment, or combination of impairments, which significantly limits the claimant's physical or mental ability to do basic work activities.[6] If the claimant does not, benefits are denied.[7]

---

[3] 20 C.F.R. § 404.1520(a).

[4] *Id.* § 404.1520(a)(4)(i).

[5] *Id.* § 404.1520(b).

[6] *Id.* § 404.1520(a)(4)(ii).

[7] *Id.* § 404.1520(c).

Step three compares the claimant's impairments to several recognized to be so severe as to preclude substantial gainful activity.[8] If an impairment meets or equals one of the listed impairments, the claimant is presumed to be disabled.[9] If an impairment does not, the disability-evaluation proceeds to step four.

Step four assesses whether an impairment prevents the claimant from performing work she performed in the past by determining the claimant's residual functional capacity (RFC).[10] If the claimant is able to perform prior work, benefits are denied.[11] If the claimant cannot perform prior work, the disability-evaluation proceeds to step five.

Step five, the final step, assesses whether the claimant can perform other substantial gainful work—work that exists in significant numbers in the national economy—considering the claimant's RFC, age, education, and work experience.[12] If so, benefits are denied. If not, benefits are granted.[13]

---

[8] 20 C.F.R. § 404.1520(a)(4)(iii).

[9] *Id.* § 404.1520(d).

[10] *Id.* § 404.1520(a)(4)(iv).

[11] *Id.*

[12] 20 C.F.R. § 404.1520(a)(4)(v); *Kail v. Heckler*, 722 F.2d 1496, 1497-98 (9th Cir. 1984).

[13] 20 C.F.R. § 404.1520(g).

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 3

The claimant has the initial burden of establishing entitlement to disability benefits under steps one through four.[14] At step five, the burden shifts to the Commissioner to show that the claimant is not entitled to benefits.[15]

## II.    Factual and Procedural Summary

Plaintiff filed a Title II application, alleging an amended disability onset date of September 10, 2011.[16] Her claim was denied initially and upon reconsideration.[17] A video administrative hearing was held before Administrative Law Judge Jesse Shumway.[18]

In denying Plaintiff's disability claim, the ALJ made the following findings:

- Step one: Plaintiff had not engaged in substantial gainful activity since September 10, 2011, the alleged onset date, through her date last insured of June 30, 2014;

- Step two: Plaintiff had the following medically determinable severe impairments: major depressive disorder, PTSD, unspecified anxiety disorder, cervical degenerative disc disease status post-surgery in

---

[14] *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007).

[15] *Id.*

[16] AR 187-88.

[17] AR 113-16 & 118-21.

[18] AR 41-78.

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 4

September 2010, right rotator cuff impingement status post-surgery in December 2011, and obesity;

- Step three: Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments;

- RFC: Plaintiff had the RFC to perform light work except:

  > she could only occasionally climb ladders, ropes, and scaffolds, and crawl; she could frequently perform all other postural activities; she could only occasionally reach overhead with the right upper extremity; she could not have concentrated exposure to hazards such as unprotected heights and moving mechanical parts; she needed a low stress job, defined as no assembly-line pace or other fast-paced work, no management responsibility, and no responsibility for ensuring the safety of others.

- Step four: Plaintiff could perform past relevant work as an internal auditor; and alternatively;

- Step five: considering Plaintiff's RFC, age, education, and work history, Plaintiff could perform other work that existed in significant numbers in the national economy, such as office helper, mail clerk, and storage facility rental clerk.[19]

When assessing the medical-opinion evidence, the ALJ gave:

---

[19] AR 12-39.

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 5

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

- great weight to the reviewing opinions of John Morse, M.D. and Louis Martin, M.D. that Plaintiff could perform light work with postural, manipulative, and environmental restrictions;

- some weight to a 2013 examining opinion,[20] the post-June 2013 treating opinions of T.H. Palmatier, M.D. and Christopher Benner, ARNP that Plaintiff could perform "light duty"; and Kirk Holle, P.T.'s treating opinion;

- little weight to the state workers compensation disability decisions, the treating opinions of David Gibbons, M.D.,[21] Dr. Palmatier in 2011 and 2012, Nurse Benner in 2013, Tim Nicholaus, PA-C in 2012, and Glenda Abercrombie, ARNP; and to the examining opinion of Lewis Almarez, M.D. and St. Elmo Newton, M.D.; and

- no weight to the opinions that predated Plaintiff's filing date or followed the date last insured.[22]

When assessing the opinions issued by mental-health professionals, the ALJ gave:

- great weight to the reviewing opinions of Nancy Winfrey, Ph.D., Sharon Underwood, Ph.D., and John Gilbert, Ph.D.;

---

[20] The ALJ indicated this opinion was from November 2011. However, the opinion is dated November 19, 2013, and was faxed on November 25, 2013. AR 630.

[21] The ALJ mistakenly referred to Dr. Gibbons as Dr. Gibbus. AR 27.

[22] AR 25-28.

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 6

- little weight to the treating opinions of Donald Williams, M.D. and the examining opinion of Richard Schneider, M.D.; and

- no weight to the opinions that predated Plaintiff's filing date or followed the date last insured.[23]

The ALJ also found that Plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, but that her statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely consistent with the medical evidence and other evidence in the record.[24] Likewise, the ALJ discounted the lay statements from Plaintiff's sister.[25]

Plaintiff requested review of the ALJ's decision by the Appeals Council, which denied review.[26] Plaintiff timely appealed to this Court.

### III.    Standard of Review

A district court's review of the Commissioner's final decision is limited.[27] The Commissioner's decision is set aside "only if it is not supported by substantial

---

[23] *Id.*

[24] AR 21.

[25] AR 26.

[26] AR 1-6.

[27] 42 U.S.C. § 405(g).

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 7

evidence or is based on legal error."[28] Substantial evidence is "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[29] Moreover, because it is the role of the ALJ and not the Court to weigh conflicting evidence, the Court upholds the ALJ's findings "if they are supported by inferences reasonably drawn from the record."[30] The Court considers the entire record as a whole.[31]

Further, the Court may not reverse an ALJ decision due to a harmless error.[32] An error is harmless "where it is inconsequential to the [ALJ's] ultimate

---

[28] *Hill v. Astrue*, 698 F.3d 1153, 1158 (9th Cir. 2012).

[29] *Id.* at 1159 (quoting *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997)).

[30] *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

[31] *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (The court "must consider the entire record as whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion," not simply the evidence cited by the ALJ or the parties.); *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) ("An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered[.]").

[32] *Molina*, 674 F.3d at 1111.

1

2

nondisability determination."[33] The party appealing the ALJ's decision generally

bears the burden of establishing harm.[34]

3

### IV.    Analysis

4

**A.    Step Two (Severe Impairment): Plaintiff establishes consequential error.**

5

6

7

Plaintiff contends the ALJ erred at step two by failing to identify her pain

disorder, also known as somatoform disorder or somatic symptom disorder during

8

Plaintiff's treatment history, as a severe impairment on the grounds that it was not

9

diagnosed before June 30, 2014—the date last insured.

10

At step two of the sequential process, the ALJ must determine whether the

11

claimant suffers from a "severe" impairment, i.e., one that significantly limits her

12

physical or mental ability to do basic work activities.[35] To show a severe mental

13

impairment, the claimant must first prove the existence of a mental impairment by

14

providing medical evidence consisting of signs, symptoms, and laboratory

15

findings.[36] If a mental impairment is proven, the ALJ then considers whether the

16

medically determinable impairment is severe or not severe. A medically

17

18

[33] *Id.* at 1115 (quotation and citation omitted).

19

[34] *Shinseki v. Sanders*, 556 U.S. 396, 409-10 (2009).

20

[35] 20 C.F.R. § 404.1520(c).

21

[36] *Id.* § 404.1521 (recognizing the claimant's statement of symptoms alone will not

22

suffice).

23

determinable impairment is not severe if the "medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work."[37] Basic mental work abilities include understanding, carrying out, and remembering simple instructions, dealing with changes in a routine work setting, and responding appropriately to supervision, coworkers, and usual work situations.[38]

Step two is "a de minimus screening device [used] to dispose of groundless claims."[39] And "[g]reat care should be exercised in applying the not severe impairment concept."[40]

The ALJ found major depressive disorder, PTSD, and unspecified anxiety disorder were severe mental impairments.[41] But the ALJ determined that "somatic symptom disorder" was not a "medically determinable impairment[] as [it was] not diagnosed before the date last insured."[42] The ALJ apparently reached this finding based on the testimony of the psychological expert, Nancy Winfrey, Ph.D., who

---

[37] SSR 85-28 at *3.

[38] 20 C.F.R. § 404.1521.

[39] *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996).

[40] SSR 85-28.

[41] AR 17.

[42] AR 18.

testified that somatic symptom disorder was not diagnosed by June 30, 2014 (the date last insured), but rather was diagnosed thereafter.[43]

The Commissioner concedes the ALJ's step-two finding that Plaintiff's somatic symptom disorder was not a severe impairment was erroneous.[44] And the Court so finds error. "Somatic symptom disorder with predominant pain persistent severe" was diagnosed by Plaintiff's treating psychologist Donald Williams, M.D. by February 13, 2014.[45] And before that somatic symptom disorder was previously referred to—and diagnosed—as either pain disorder or somatoform disorder by the treating, examining, and reviewing physicians and psychologists. For instance, Dr. Williams began diagnosing Plaintiff with pain disorder associated with psychological factors and a general medical condition in September 2009[46]; Kenneth Muscatel, Ph.D. first noted the need to rule out pain disorder associated with both psychological factors and a general medical condition in October 2009 and then diagnosed such a pain disorder in March 2011[47]; David Bachman, Psy.D. diagnosed a similar pain disorder in September 2011[48]; Lewis Almaraz, M.D. and

---

[43] AR 50.

[44] ECF No. 11 at 9-10.

[45] AR 1564.

[46] AR 1091.

[47] AR 755 & 768.

[48] AR 591.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

St. Elmo Newton III, M.D. listed pain disorder as an accepted condition and diagnosis in November 2013[49]; Richard Schneider, M.D. included pain disorder as an accepted condition and diagnosis in November 2013[50]; Sharon Underwood, Ph.D. listed somatoform disorder as a severe impairment during the relevant period[51]; and John Gilbert, Ph.D. listed somatoform disorder as a severe impairment during the relevant period.[52] Given that these medical providers and reviewers found that Plaintiff suffered from pain disorder/somatoform disorder/somatic symptom disorder (hereinafter, referred to as "somatic symptom disorder") before June 30, 2014, the ALJ's finding that Plaintiff did not have such a disorder before that date is not supported by substantial evidence.

The Commissioner argues that this error was harmless because the ALJ proceeded through the subsequent disability-evaluation steps and considered the evidence relating to Plaintiff's allegations of pain and all associated functional limitations, such as difficulties walking, standing, lifting, and concentrating.[53] However, at step three (listings), the ALJ only considered the symptoms of Plaintiff's "found" medically determinable impairments of major depressive

---

[49] AR 852.

[50] AR 655.

[51] AR 86.

[52] AR 101-02.

[53] ECF No. 11 at 9-10.

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 12

disorder, PTSD, and unspecified anxiety disorder.[54] Likewise, when crafting the RFC, the ALJ only considered the symptoms resulting from the "underlying medically determinable physical or mental impairment(s)."[55] And when considering whether Plaintiff's symptoms were consistent with the record, the ALJ found Plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence, and limiting effects of these symptoms" were not entirely consistent with the record."[56] Accordingly, the ALJ did not consider the symptoms related to Plaintiff's somatic symptom disorder, which was not deemed to be a medically determinable impairment—during the subsequent evaluation steps. This is consequential as many of the treating and examining providers considered the interplay between Plaintiff's psychological and physical conditions and how Plaintiff was functionally limited due to her somatic symptom disorder when issuing their opinion.[57] The Court cannot determine on this record that the ALJ's

---

[54] AR 19.

[55] AR 20.

[56] AR 21.

[57] *See, e.g.*, AR 1324 ("This woman has a fighting chance of being able to [return to work] at some point, but all the gears must mesh, including continuity of medical and psychiatric treatment including all pharmacologic agents."); AR 1303 ("I wanted to convey to you my concern that her apparently worsening medical

failure to consider somatic symptom disorder as a severe impairment before the date last insured did not impact the ALJ's disability denial.

## B.    Plaintiff's Symptom Reports: Plaintiff establishes consequential error.

Plaintiff argues the ALJ failed to provide valid reasons for rejecting her symptom reports. When examining a claimant's symptom reports, the ALJ must make a two-step inquiry. "First, the ALJ must determine whether there is objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged."[58] Second, "[i]f the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the

---

condition is overshadowing and beginning to reverse the improvement I have been seeing in her psychiatric and neuropsychological condition."); AR 1412 (Plaintiff's "very limited energy is a significant limiting factor in terms of [return to work] prognosis."); AR 963 (recognizing that Plaintiff's inability to work was predominately due to psychiatric issues but that she was being treated for limiting physical conditions as well); AR 591 (recognizing that Plaintiff's higher somatic complaints were likely due to psychiatric reasons); AR 559-62 (finding that Plaintiff was likely to develop physical symptoms in response to stress, such as somatic symptoms of headaches, neck pain, and shoulder pain).

[58] *Molina*, 674 F.3d at 1112.

1

2

claimant's testimony about the severity of the symptoms if [the ALJ] gives 'specific, clear and convincing reasons' for the rejection."[59]

3

4

5

6

7

As discussed above, the ALJ found there was objective medical evidence only to support major depressive disorder, PTSD, unspecified anxiety disorder, and the physical impairments of cervical degenerative disc disease status post-surgery, right rotator cuff impingement status post-surgery, and obesity—not Plaintiff's somatic symptom disorder.[60]

8

9

10

11

12

13

14

15

16

Yet, the Commissioner argues that the ALJ considered *all* of Plaintiff's symptoms, including pain, and therefore the ALJ's erroneous step-two finding did not impact the ALJ's weighing of Plaintiff's symptom reports.[61] However, the ALJ only considered the extent to which Plaintiff's reported symptoms were consistent with the "found" medically determinable impairments, e.g., "any limitations arising from Plaintiff's impairments [found diagnosed as of the date last insured] are accounted for sufficiently in the residual function capacity."[62] With that lens, which did not include considering whether Plaintiff's reported symptoms were consistent with pain disorder, the ALJ found Plaintiff's statements concerning the intensity,

17

18

19

---

[59] *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014) (quoting *Lingenfelter*, 504 F.3d at 1036).

20

[60] AR 17.

21

[61] ECF No. 11 at 8-11.

22

[62] AR 29.

23

persistence, and limiting effects of her symptoms were inconsistent with the "quite unremarkable" objective medical evidence and clinical observations, Plaintiff's statements during appointments, and her "robust activities of daily living."[63] Accordingly, the ALJ only incorporated those limitations, which the ALJ deemed to be consistent with Plaintiff's found medically determinable impairments, into the RFC.

Yet, Plaintiff's treating providers and examining evaluators determined that Plaintiff experienced additional physical symptoms as a result of her somatic symptom disorder. Moreover, two of the ALJ's reasons for discounting Plaintiff's symptoms are either not supported by substantial evidence and/or must be more meaningfully explained on remand. First, the ALJ discounted Plaintiff's symptom reports because they were inconsistent with her reports during her appointments.[64] As to Plaintiff's physical complaints, the ALJ found them inconsistent with Plaintiff's report that she could walk one mile on even ground. However, the ALJ did not identify how Plaintiff's ability to walk one mile was inconsistent with her reported difficulties doing activities that involved her right shoulder and neck movement, such as washing dishes, cooking, vacuuming, and doing laundry.[65] And

---

[63] AR 21 & 25.

[64] AR 25.

[65] *See Ghanim*, 763 F.3d at 1164 (recognizing that the ALJ may not discount symptoms because of nonrelevant normal findings).

while treatment records note that Plaintiff was walking several miles, these records were largely from after the date last insured and before the administrative hearing date.[66]

As to Plaintiff's mental-symptom complaints, the ALJ found them inconsistent with her report to Dr. Williams that she responded well to stressful situations, like a fight at one of her daughter's soccer games, thereby demonstrating an intact ability to manage her symptoms and interact with others.[67] The ALJ though did not discuss that Plaintiff's mental impairments waxed and waned. Several months before Plaintiff exercised restraint at the soccer game in February 2014,[68] Plaintiff was observed being tearful through therapy sessions, with more evident depression, and with impaired memory.[69] Then

---

[66] *See, e.g.*, AR 1684 (June 2014) (reporting to treating providers that she walked but that she would experience dizziness when she bent over); AR 1750 (June 2015: walking 6 miles a day); AR 1709 (July 2015: walking 6 miles a day); AR 1723 (Aug. 2015: walking 5 miles a day); AR 1873 (July 2016: walking about 6 miles a day); AR 1783 (July 2017: can no longer walk 6 miles a day due to pain and dysfunction).

[67] AR 25.

[68] AR 1566.

[69] *See, e.g.*, AR 1506-07 (July 2013: mild to moderate irritability, fair to low energy, depressed tone, tearful through most of session, and feeling guilt for multiple matters, which are not reality based); AR 1508-09 (Aug. 2013: mild to moderate

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

beginning in October 2013, Plaintiff's symptoms began waning—although Dr.
Williams still opined that Plaintiff was at her limit for activity with her one college
course and that she still had difficulty with multitasking as she had problems
remembering when to pay her bills.[70] Then after February 2014, Plaintiff's
psychiatric state was impacted because her medication was not filled due to an
insurance-dilemma. From late March through the date last insured in June 2014,
Plaintiff's mental symptoms (and medical side effects) waxed.[71] The ALJ did not

---

irritability, fair to low energy, depressed tone, more evident depression); AR 1510-
11 (Aug. 2013: mild to moderate irritability, fair to low energy, depressed tone,
impaired memory, fair concentration, and continued depression); AR 1512-13 (Aug
2013: depressed tone, impaired memory, and fair concentration); & AR 1518-19
(fair energy, tearful during session; memory is impaired; concentration is fair, and
more distress).

[70] *See, e.g.*, AR 1529-31; AR 1533 (Oct. 24, 2013: memory and concentration were
clinically improved, as well as her social, educational, and functioning approved);
AR 1536-39 (Nov. 2017: same).

[71] *See, e.g.*, AR 1684-85 (June 17, 2014: reporting difficulty pronouncing words and
generalized muscle cramping and stiffness, resulting from medication); AR 1575-78
(July 17, 2014: "She has become far more irritable since the Abilify was reduced . . .
. She punched a wall, she cannot manage her anger and irritability, and she is
more depressed." And "[s]he was essentially without medication for a period of one

include any limitations for when Plaintiff's mental impairments waxed. Instead, the only non-exertional, non-positional, and non-environmental limitation in the RFC limited Plaintiff to a low-stress job, which meant no assembly-line pace or other fast-paced work, no management responsibility, and no responsibility for ensuring the safety of others. As a result, the RFC did not include any limitations to account for her reported poor memory, concentration, or temper-control when her symptoms waxed. Moreover, the RFC did not account for Plaintiff's claim that her somatic symptom disorder (and other symptoms resulting from her depression, PTSD, and anxiety) impact her ability to sustain her attention, concentration, and memory for a full workday when her symptoms worsen. On remand, the ALJ is to more meaningfully explain how the RFC sufficiently accounts for Plaintiff's symptoms during the relevant period when they worsened.

Second, the ALJ discounted Plaintiff's symptom claims because they were inconsistent with her "robust activities of daily living."[72] If a claimant can spend a substantial part of the day engaged in pursuits involving the performance of exertional or non-exertional functions, the ALJ may find these activities

---

month until she got her private insurance straightened out. She regressed dramatically during this one month period and was forced to drop her college classes. Her parenting became quite ineffective as well.").

[72] AR 25.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

inconsistent with the reported disabling symptoms.[73] Here, the activities cited by the ALJ were that Plaintiff cared for children and pets, prepared meals, helped with household chores like vacuuming and cleaning the toilet, drove, shopped in stores, and scrapbooked. Plaintiff though testified that she interspersed these activities throughout the day, week, or month due to her depression, pain, and other symptoms.[74] For instance, Plaintiff reported that she vacuumed and cleaned the toilet and sink once a month.[75] She reported that she shops every couple of weeks for about an hour with assistance from her two teenage daughters.[76] As to scrapbooking, Plaintiff reported that she only scrapbooks about twice a year due to pain.[77] These monthly and bi-yearly activities are not "robust activities of daily living," even when considered with Plaintiff's ability to care for her personal hygiene.

Plaintiff did take college courses during part of the relevant time period, with an accommodation that Plaintiff have a "distraction free environment for her to take tests, as well as some additional time for test completion."[78] In the spring of

---

[73] *Molina*, 674 F.3d at 1113.

[74] AR 19 & 25.

[75] AR 259.

[76] AR 260.

[77] AR 262.

[78] AR 1478-79.

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 20

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

2013, Plaintiff enrolled in one community college class; she did well in this math course.[79] Then she took another class (Spanish) during the fall quarter of 2013, for which she studied two hours a day and did well.[80] Then during the next quarter, she attempted two classes, Spanish 2 and an Excel spreadsheet class.[81] Dr. Williams noted that Plaintiff's choice to take two college courses would be "the limit of her potential for activity at this point when measured in hours per week" and that "she is definitely not capable of full time gainful employment at this point in time."[82] Then because of confusion between what insurer (state or private) was to pay for Plaintiff's medications, there was a month gap in her psychiatric medications being filled.[83] As a result, Plaintiff's psychiatric condition worsened, and she had to withdraw from her classes.[84] It took until late August 2014 until Plaintiff was back to the "mental baseline" that she was at in January 2014.[85] Given that Plaintiff did not successfully complete more than one college course at a time during the relevant time period, and she received testing accommodation, the

---

[79] AR 1036 & 1484.

[80] AR 1524-48.

[81] AR 1049 & 1540.

[82] AR 1553.

[83] AR 1055.

[84] AR 1055 & 1599.

[85] AR 1599.

ALJ's finding that Plaintiff's college-course undertaking was "more mentally demanding than the residual functional capacity [the ALJ] assigned" is not supported by substantial evidence.

Lastly, the ALJ discounted Plaintiff's symptom reports because they were inconsistent with the objective medical evidence and clinical observations that the ALJ deemed to be quite unremarkable, as she ambulated normally, her IQ scores were above average, and her mental status exams were generally normal or minimally abnormal. On remand, the ALJ is to explain why Plaintiff's observed normal ambulation served as a basis to discount her symptoms related to the pain she experiences when reaching or bending her neck and back. In addition, as discussed below in connection with the medical records, Plaintiff's treating psychologist and the examining mental-health physicians all agreed that Plaintiff suffered from severe depression, notwithstanding her average or above-average IQ scores. The assigned non-exertional limitations were not related to any IQ deficiencies but rather memory, attention span, and behavioral limitations resulting from her depression, PTSD, anxiety, somatic symptom disorder, and medication side effects. On remand, the ALJ may not discount Plaintiff's reported symptoms based on irrelevant normal medical findings.[86]

Finally, assuming that the ALJ's description of Plaintiff's "mental status exams [as] generally normal or minimally abnormal" is a reasonable finding

---

[86] *See Ghanim*, 763 F.3d at 1164.

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 22

supported by substantial evidence, this sole reason, which is based on the ALJ's interpretation of the objective medical evidence (which did not include considering somatic symptom disorder as an impairment), cannot serve as the sole basis on which to discount Plaintiff's symptom reports.[87]

In summary, Plaintiff establishes the ALJ erred by discounting Plaintiff's symptom reports.

**C.    Medical Opinions: Plaintiff establishes consequential error.**

Plaintiff challenges the ALJ's assignment of little weight to the treating providers and assignment of great weight to the reviewing physicians. The ALJ's weighing of the medical opinions was based on an erroneous finding that Plaintiff's somatic symptom disorder was not a severe impairment during the relevant period. As discussed below, this consequentially impacted the ALJ's weighing of the medical evidence given the significant interplay between Plaintiff's medical and psychological conditions.

---

[87] *Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005) (recognizing that pain complaints may not be fully corroborated by medical evidence); *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) (recognizing that symptom reports cannot be solely discounted on the grounds that they were not fully corroborated by the objective medical evidence); *Bunnell v. Sullivan*, 947 F.2d 341, 346-47 (9th Cir. 1991); *Fair v. Bowen*, 885 F.2d 597, 601 (9th Cir. 1989).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

    1.   <u>Standard</u>

The weighing of medical-source opinions is dependent upon the nature of the medical relationship, i.e., 1) a treating physician; 2) an examining physician who examines but did not treat the claimant; and 3) a reviewing physician who neither treated nor examined the claimant.[88] Generally, more weight is given to the opinion of a treating physician than to an examining physician's opinion and both treating and examining opinions are to be given more weight than the opinion of a reviewing physician.[89]

When a treating physician's or evaluating physician's opinion is not contradicted by another physician, it may be rejected only for "clear and convincing" reasons, and when it is contradicted, it may be rejected for "specific and legitimate reasons" supported by substantial evidence.[90] A reviewing physician's opinion may be rejected for specific and legitimate reasons supported by substantial evidence, and the opinion of an "other" medical source[91] may be

---

[88] *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014).

[89] *Id.*; *Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir. 1995).

[90] *Lester*, 81 F.3d at 830.

[91] *See* 20 C.F.R. § 404.1502 (For claims filed before March 27, 2017, acceptable medical sources are licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, qualified speech-language pathologists, licensed audiologists, licensed advanced practice registered nurses, and licensed physician

rejected for specific and germane reasons supported by substantial evidence.[92] The opinion of a reviewing physician serves as substantial evidence if it is supported by other independent evidence in the record.[93]

### 2.    Non-Exertional-Limitations Opinions

Shortly after her workplace injury in January 2009, Plaintiff began psychotherapy with Dr. Williams. Her therapy with Dr. Williams continued for at least eight years. Her therapy sessions with Dr. Williams were approximately weekly until October 2015, when they changed to monthly or less.[94] As he treated Plaintiff and adjusted her medications, Dr. Williams' diagnoses changed slightly, but near June 2014 (date last insured), he diagnosed Plaintiff with major depressive disorder recurrent mild, posttraumatic stress disorder, somatic symptom disorder with predominant pain persistent moderate, unspecified anxiety disorder, and personality trait disturbances.[95] Although Dr. Williams opined on occasion that Plaintiff could perform part-time work (or take college course(s)), Dr. Williams consistently opined through the relevant period that Plaintiff was unable

---

assistants within their scope of practice—all other medical providers are "other" medical sources.).

[92] *Molina*, 674 F.3d at 1111; *Bruce v. Astrue*, 557 F.3d 1113, 1115 (9th Cir. 2009).

[93] *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995).

[94] *See* AR 1752 (indicating the change to monthly sessions).

[95] AR 1684 (June 17, 2014).

to return to fulltime work.[96] In October 2015, Dr. Williams completed a Mental Residual Functional Capacity Assessment and opined that Plaintiff's abilities to:

- interact appropriately with the general public, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, and travel in unfamiliar places or use public transportation were not impaired;

- carry out very short and simple instructions, work in coordination with or proximity to others without being districted by them, and be aware of normal hazards and take appropriate precautions were mildly impaired;

- remember locations and work-like procedures, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and set realistic goals or makes plans independently of others were moderately impaired; and

- understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an

---

[96] *See, e.g.*, AR 1251, 1258, 1323, 1366, 1368, 1373, 1378, 1382, 1395, 1454, 1543, 1553, & 1587.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

   ordinary routine without special supervision; make simple work-

   related decisions; complete a normal workday and workweek without

   interruptions from psychologically based symptoms and perform at a

   consistent pace without an unreasonable number and length of rest

   periods; and respond appropriately to changes in the work setting

   were markedly limited.[97]

The ALJ gave little weight to Dr. Williams' opinions for the "reasons Dr. Winfrey

outlined" and because Dr. Williams' opinions were inconsistent with the GAF

scores of 65 that Dr. Williams assigned in June 2014 and much of the preceding

year.[98]

   First, as to Dr. Winfrey, the ALJ did not identify "the reasons Dr. Winfrey

outlined." But during the administrative hearing, Dr. Winfrey testified that

treating providers, from September 2011 to June 2014, diagnosed Plaintiff with

major depressive disorder, unspecified anxiety disorder, and some cognitive

disorder due to head injury.[99] As mentioned above, Dr. Winfrey determined that

somatic symptom disorder was not diagnosed before June 30, 2014.[100] Dr. Winfrey

also determined that the record reflected that Plaintiff did not have any cognitive

---

[97] AR 668-69.

[98] AR 26.

[99] AR 49.

[100] AR 50.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

disorder given her cognitive test results on July 24, 2012, and the fact that she was getting As in her accounting classes.[101] Based on Plaintiff's travel to her daughter's soccer game, attending college classes, and being described as articulate and analytical during a May 19, 2015[102] counseling session, Dr. Winfrey opined that Plaintiff's ability to understand, remember, and apply information was at the most mildly impaired; her ability to interact with others was moderately impaired; her ability to concentrate, persist, and maintain pace was mildly impaired, and her ability to adapt or manage herself was mildly impaired.[103] Dr. Winfrey opined that Plaintiff had no limitations about "instructions or things of that nature but I think she should have a low stress job to keep that anxiety down," and so she should not manage a team or have a quick production quota.[104] Dr. Winfrey advised that she disagreed with Dr. Williams' no-work opinion as it was inconsistent with Plaintiff's cognitive test-score results and her ability to do well at her college classes.[105] The ALJ gave great weight to Dr. Winfrey's opinion because 1) she had the opportunity

---

[101] AR 51.

[102] Dr. Winfrey stated the noted observation was from May 19, *2014*. AR 52. However, these observations were made by Dr. Williams in May 2015, which is *after* the date last insured of June 2014.

[103] AR 51-52.

[104] AR 52-53.

[105] AR 55-56.

to review the entire longitudinal medical record, 2) gave reasonable explanations for her opinion, and 3) had Social Security disability-program knowledge.[106] Nevertheless, the ALJ did find that Plaintiff was moderately limited in her ability to adapt and manage herself, rather than mildly limited in this ability as Dr. Winfrey opined.[107]

The extent to which a medical source is "familiar with the other information in [the claimant's] case record" is relevant in assessing that source's medical opinion.[108] While Dr. Winfrey had the opportunity to review the entire file, Dr. Williams issued the bulk of the treating psychological records, which spanned more than eight years, and he reviewed the examining psychological evaluations conducted by Kenneth Muscatel, Ph.D., Frederick Montgomery, M.D., David Bachman, Psy.D., and Richard Schneider, M.D.[109] In addition, Dr. Williams

---

[106] AR 26.

[107] *Id.*

[108] 20 C.F.R. § 404.1527(c)(6).

[109] *See* AR 557-64, 585-99, 645-58, 741-68, 819-31, 1125, 1165, 1227, 1231-34, 1265, 1308, 1311, 1316-17, 1460-61, & 1692-98. Plaintiff also argues the ALJ erred by not assigning weight to Dr. Bachman's or Dr. Montgomery's evaluations. However, these evaluations did not include functional limitations and so the ALJ did not err by not assigning weight to these evaluations. *See Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1223 (9th Cir. 2010); *Valentine v. Comm'r, Soc. Sec. Admin.*, 574

conferred with Dr. Muscatel about his findings and Plaintiff's treatment.[110] Dr. Williams also conferred with Plaintiff's treating provider about her physical conditions and was aware of Plaintiff's diagnosed medical conditions and treatment for such, including surgeries and physical therapy. Given that Dr. Williams created and/or reviewed most, if not all, of the relevant psychological records, the ALJ must more meaningfully explain why Dr. Winfrey was more familiar with the relevant information in Plaintiff's case record than Dr. Williams, if the ALJ on remand is to give more weight to Dr. Winfrey's opinion for this reason.[111]

---

F.3d 685, 691 (9th Cir. 2009). Yet, on remand, the ALJ is to consider these evaluations when assessing whether Dr. Williams' opinions were consistent with and supported by the longitudinal medical record.

[110] AR 1125, 1229, 1231, 1234, 1236, 1239, 1258, & 1263.

[111] *See Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988) (requiring the ALJ to identify the evidence supporting the found conflict to permit the Court to meaningfully review the ALJ's finding); *Blakes v. Barnhart,* 331 F.3d 565, 569 (7th Cir. 2003) ("We require the ALJ to build an accurate and logical bridge from the evidence to her conclusions so that we may afford the claimant meaningful review of the SSA's ultimate findings.")

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

Next, the Social Security regulations "give more weight to opinions that are explained than to those that are not."[112] "[T]he ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory and inadequately supported by clinical findings."[113] However, if treatment notes are consistent with the opinion, a conclusory opinion, such as a check-the-box form, may not automatically be rejected.[114] Here, the ALJ found that Dr. Winfrey's testamentary opinion was more supported than Dr. Williams' opinions, which were accompanied by years of treatment records. However, as explained above, Dr. Winfrey failed to recognize that Plaintiff had been diagnosed with somatic symptom disorder. On remand, the ALJ is to reassess the extent to which the medical opinions were supported by and consistent with the medical evidence.

As to Dr. Winfrey's knowledge as to Social Security disability requirements, the amount of an acceptable medical source's knowledge of Social Security disability programs and their evidentiary requirements may be considered in

---

[112] *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001) (citing 20 C.F.R. 404.1527).

[113] *Bray v. Commissioner*, 554 F.3d 1219, 1228 (9th Cir. 2009).

[114] *See Garrison*, 759 F.3d at 1014 n.17; *see also Trevizo v. Berryhill*, 871 F.3d 664, 677 n.4 (9th Cir. 2017) ("[T]here is no authority that a 'check-the-box' form is any less reliable than any other type of form").

evaluating an opinion.[115] However, this factor by itself is an insufficient basis to give more weight to Dr. Winfrey's opinion than Dr. Williams' treating opinion if the basis for Dr. Williams' no-work opinion is consistent with the Social Security's evidentiary requirements.

As to the ALJ's decision to discount Dr. Williams' opinion because it was inconsistent with Plaintiff's GAF scores,[116] the ALJ later in the opinion recognized that the Commissioner has declined to endorse GAF scales in reviewing Social Security claims as they do not have a direct correlation to the severity of a mental disorder.[117] Therefore, the ALJ gave little weight to the GAF scores "because they

---

[115] 20 C.F.R. § 404.1527.

[116] Global Assessment of Functioning (GAF) scores represent a "clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders* ("DSM-IV-TR") 32 (4th ed. 2000). The scale is divided into ten ranges reflecting different levels of functioning, with 1–10 being the lowest and 91–100 the highest. *Id.* DSM-V dropped the GAF "for several reasons, including its lack of conceptual clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice." *American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders* 16 (5th ed. 2013).

[117] AR 28.

are not standardized and the scores were largely given without any explanation."[118] Nonetheless, the ALJ gave "some weight to the general upward trend [of the GAF scores] reflected in the psychiatric treatment notes (from 42 to 55 to 60-65)" and therefore discounted Dr. Williams' no-work opinions on this basis.[119]

The ALJ's finding that Plaintiff's GAF scores generally trended upward is supported by substantial evidence. However, even when Plaintiff's scores trended upward they continued to border between two GAF ranges—51-60 and 61-70—only staying fully above 61 once in 2010 and then in June 2013.[120] A GAF score of

---

[118] *Id.*

[119] *Id.*

[120] GAF scores during and near the relevant time frame (when not otherwise indicated, the GAF score was authored by Dr. Williams): AR 592 (Sept. 2, 2011: Bachman, GAF 45); AR 1304-18 (Sept. 8 to Oct. 26, 2011: GAF 60); AR 1322-40 (Nov. 17 & Dec. 1, 2011: GAF 55-60); AR 1344 (Jan. 5, 2012: GAF 45); AR 1349 (Jan. 12, 2012: GAF 50); AR 1351 (Feb. 2, 2012: GAF 55); AR 1353 (Feb. 9, 2012: GAF 45-50); AR 583 & 1362-66 (Feb. 16 to March 8, 2012: GAF 55-60); AR 1368-75 (March 15-29, 2012: GAF: 60); AR 1377-79 (Apr. 19 & 26, 2012: GAF 50-60); AR 1384-1428 (May 3 to Oct. 11, 2012: GAF 55-65); AR 819 (July 24, 2012: Bachman, GAF 55-65); AR 1429-38 (Oct. 18 to Nov.15, 2012: GAF 60-65); AR 1439-56 (Nov. 29, 2012, to Jan. 24, 2013: GAF 60); AR 1457-92 (Jan. 31 to May 30, 2013: GAF 60-65); AR 839 (Feb. 12, 2013: Bachman, GAF 60-65); AR 1494-1502 (June 6-20, 2013:

51-60 represents moderate symptoms (e.g., flat and circumstantial speech, occasional panic attacks) *or* moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with co-workers).[121] A GAF score of 61-70 represents some symptoms (e.g., depressed mood and mild insomnia) *or* some difficulty in social, occupation, or school functioning (e.g., occasional truancy, or theft with the household), but generally functioning pretty well, has some meaningful interpersonal relationships.[122]

To the extent the ALJ gave the GAF score-trend weight, the ALJ rationally found that Plaintiff's GAF scores of 61 or more were inconsistent with Dr. Williams' opinion that Plaintiff could not sustain *any* full-time work. However, during the relevant time frame Plaintiff's GAF scores waxed and waned and often included a GAF score in the moderate-limitation range. On remand, the ALJ is to

---

GAF 65); AR 1502-06 (July 18 & 25, 2013: GAF 55-60); AR 1510-1512 (Aug. 7 & 15, 2013: GAF 55); AR 1514 (Aug. 29, 2013: GAF 55-65); AR 1518 (Sept. 5, 2013: GAF 55-60); AR 1520-30 (Sept. 12 to Oct. 17, 2013 (GAF 60); AR 1532-34 (Oct. 24 & 31, 2013: GAF 60-65); AR 654 (Schneider, Nov. 19, 2013: GAF 66); AR 1536-45 (Nov. 7, 2013, to Jan. 30, 2014: GAF 65); AR 1566-70 (Feb. 18-27, 2014: GAF 60-65); AR 1575 (July 17, 2014: GAF 50-55).

[121] DSM-IV-TR.

[122] *Id.*

consider whether additional restrictions to the RFC are required to reflect the waxing of Plaintiff's mental conditions.[123]

Finally, on remand, if the ALJ continues to give great weight to Dr. John Gilbert's reviewing opinion, the ALJ is to incorporate his opinion that Plaintiff had moderate limitations in interacting appropriately with the general public and getting along with coworkers or peers without distracting them or exhibiting behavioral extremes into the RFC, or explain how the RFC accounts for these moderate limitations if accepted.[124]

### 3.    Exertional-Limitations Opinions

On remand, the ALJ is to reweigh the medical opinions regarding Plaintiff's exertional limitations. When doing so, the ALJ is to consider that several of the opinions released Plaintiff to "light duty," a term of art for Washington State Department of Labor and Industries' purposes. "Light duty" for Labor and Industries' purposes has a different meaning than "light work" for Social Security disability purposes.

"Light duty" for Labor and Industries' purposes pertains to transitional work to assist the worker to return to work, such as working shorter hours, performing different duties with lighter physical demands than the prior job, or adjusting job or worksite to meet physical limitations by providing tools, equipment, or

---

[123] *See, e.g., Goff v. Barnhart*, 421 F.3d 785, 789, 791, 793 (8th Cir. 2005).

[124] AR 106-07.

appliances.[125] Whereas, "light work" for Social Security purposes "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds . . . [and] requires a good deal of walking or standing, or . . . sitting most of the time with some pushing and pulling of arm or leg controls."[126]

The distinction between these terms is important as the medical providers treating Plaintiff's injuries resulting from her 2009 workplace injury were issuing opinions for Labor and Industries' purposes and therefore the terminology used is to be interpreted in the context the medical records and opinions were issued.[127] The Court is uncertain whether the ALJ appreciated this distinction and how it impacted the ALJ's weighing of the medical opinions.[128]

---

[125] Available at https://lni.wa.gov/claims/for-workers/getting-back-to-work/light-duty-job (last viewed April 17, 2020).

[126] 20 C.F.R. 404.1567(b).

[127] See Orn v. Astrue, 495 F.3d 625, 634 (9th Cir. 2007) ("The primary function of medical records is to promote communication and recordkeeping for health care personnel—not to provide evidence for disability determinations.").

[128] See, e.g., T.H. Palmatier, M.D.: AR 1002-03 (March 2011: "Light duty work return considering her physical issues would be expedited by the orthopedic evaluation that is still pending regarding the right shoulder issues as well as follow-up with Dr. Atteberry planned next month."); AR 1021 (May 2012: "I am hoping that she will continue to improve as she has been doing and that we will be

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

     For instance, the ALJ discounted physical therapist Kirk Holle's July 2014 evaluation,[129] instead agreeing with "the medical expert [Dr. Morse] that the longitudinal record demonstrated greater capabilities."[130] Dr. Morse, however, testified that he could not comment on Mr. Holle's physical-therapist opinion because physical therapists use different discipline language and criteria than Dr.

---

able to give her a light duty release from a physical perspective at least."); AR 1040 (June 2013: "EMPLOYABILITY: light duty work"). Christopher Benner, ARNP: AR 1039 (May 2013: "employable to light duty"); AR 1041-46 (Aug. to Dec. 2013: same). Glenda Abercrombie, ARNP: AR 936 (Feb. 2014: work modified duty for four hours); AR 1051 (March 2014: "released to a light duty work status"); AR 937 (March 2014: may perform modified work with seldom reaching and working above shoulders and only occasionally lifting of ten pounds); AR 1053-56 (Apr. and June 2014: "released to a light duty work status"); AR 938 (may perform modified work with seldom work above right shoulder and only occasional lifting and carrying of ten pounds). Kirk Holle, P.T.: AR 889 (July 2014: recommended "light duty position"). *See also* AR 729 (Dr. Montgomery's psychological evaluation: "I would only add to encourage her to return to some type of cognitive work activity as a volunteer or return to work in light duty to facilitate intellectual activity prior to any further neuropsychological examinations.").

[129] AR 866-91.

[130] AR 27.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

Morse's medical community.[131] There is no meaningful explanation on this record as to why a physical therapist's language and criteria, if different, would impact Mr. Holle's observed findings as to Plaintiff's lifting and carrying abilities, which result in more restrictive functional limitations than those contained in the RFC and hypotheticals two and three.[132] Moreover, Mr. Holle's lifting restrictions were generally consistent with the 2013 medical examiner's opinion that Plaintiff could occasionally lift up to ten pounds, which is less than light work's frequent lifting/carrying of ten pounds.[133]

Also, for purposes of remand, the Court notes that the ALJ summarily concluded that, because Dr. Gibbons', PA-C Nicholaus', and Nurse Abercrombie's checkbox forms indicated that Plaintiff was not released to work for periods less than a year, these providers found Plaintiff's limitations temporary in nature.[134] Temporary limitations are not enough to meet the durational requirement for a

---

[131] AR 48.

[132] *See* AR 866-91 (July 2014: Mr. Holle recommended sedentary work with the ability to change position every hour, lifting ten pounds occasionally from waist to shoulder, all other lifting and carrying limited to seldom, and seldom reaching overhead with right upper extremity.).

[133] AR 630.

[134] AR 27.

finding of disability.[135] Here, however, the ALJ must be mindful that these opinions were being issued for Labor and Industries' purposes and must consider the cumulative impact of each of these short-duration opinions pertaining to Plaintiff's shoulder and neck injuries. And the ALJ may not summarily dismiss these as check-box opinions to the extent they are supported by treating notes.

**D. Consequential Errors: The ALJ must reevaluate all steps.**

The Commissioner argues that the ALJ's errors were harmless because the vocational expert testified that there were available jobs (waxer, masker, and lens insert) for an alternative RFC that included simple, routine, repetitive tasks; routine predictable work environment with no more than occasional changes; and no more than superficial contact with the public, coworkers, and supervisors. The vocational expert also testified, however, that if Plaintiff is off task more than 10 percent, misses more than one day of work per month, or if she is restricted to occasional fingering with her dominant hand, these jobs would not be available.[136]

---

[135] 20 C.F.R. § 404.1520 (requiring a claimant's impairment to be expected to last for a continuous period of not less than twelve months); 42 U.S.C. § 423(d)(1)(A) (same); *Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1165 (9th Cir. 2008) (affirming the ALJ's finding that treating physicians' short-term excuse from work was not indicative of "claimant's long-term functioning").

[136] AR 72-77.

Accordingly, it is not clear that the ALJ's errors as to Plaintiff's somatic symptom disorder and weighing of Plaintiff's testimony and the medical opinions are harmless. The ALJ on remand is to proceed with a new sequential analysis, including reassessing Plaintiff's RFC.

**E.     Remand for Further Proceedings**

Plaintiff submits a remand for payment of benefits is warranted.

The decision whether to remand a case for additional evidence, or simply to award benefits is within the discretion of the court."[137] When the court reverses an ALJ's decision for error, the court "ordinarily must remand to the agency for further proceedings."[138] However, the Ninth Circuit has "stated or implied that it would be an abuse of discretion for a district court not to remand for an award of benefits" when three credit-as-true conditions are met and the record reflects no serious doubt that the claimant is disabled.[139]

---

[137] *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987) (citing *Stone v. Heckler*, 761 F.2d 530 (9th Cir. 1985)).

[138] *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017); *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004) ("[T]he proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation"); *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014).

[139] *Garrison*, 759 F.3d at 1020 (9th Cir. 2014) (citations omitted).

Here, even if Plaintiff's somatic symptom disorder is considered severe, it is not clear what additional exertional and non-exertional limitations are to be added to the RFC. Therefore, additional proceedings are necessary to determine whether Plaintiff is disabled. Remand for further proceedings, rather than for an award of benefits, is necessary.[140] On remand, the ALJ is to consider Plaintiff's somatic symptom disorder as a severe impairment, reweigh Plaintiff's symptom reports and the medical-opinion evidence, and reevaluate the sequential process.

## V.    Conclusion

Accordingly, **IT IS HEREBY ORDERED**:

1.  Plaintiff's Motion for Summary Judgment, **ECF No. 10**, is **GRANTED**.

2.  The Commissioner's Motion for Summary Judgment, **ECF No. 11**, is **DENIED**.

3.  The Clerk's Office shall enter **JUDGMENT** in favor of Plaintiff REVERSING and REMANDING the matter to the Commissioner of Social Security for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

///

///

///

///

---

[140] *See id.* at 1021; *Revels v. Berryhill*, 874 F.3d 648, 668 (9th Cir. 2017).

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 41

4.  The case shall be **CLOSED**.

**IT IS SO ORDERED.**  The Clerk's Office is directed to file this Order, provide copies to all counsel, and close the file.

**DATED** this 10th  day of June 2020.

s/Edward F. Shea
_____
EDWARD F. SHEA
Senior United States District Judge
